IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**CRAIG COTTON** **PLAINTIFF**

**v.** **NO. 4:25-cv-01287-JM-PSH**

**COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION** **DEFENDANT**

# FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Recommendation has been sent to United States District Judge James M. Moody, Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

In this case, filed pursuant to 42 U.S.C. 405(g), plaintiff Craig Cotton ("Cotton") challenges the denial of his application for supplemental security income payments. He does so on the following grounds: (1) the assessment of his residual functional capacity is flawed because the assessment is not supported by medical evidence of his ability to stand or walk after his right knee surgery, and the Appeals Council erred when it refused to consider new evidence relevant to his ability to stand or walk after the surgery; (2) the assessment is flawed because his subjective complaints were not properly evaluated; and (3) the Administrative Law Judge ("ALJ") erred at step five of the sequential evaluation process when he failed to solicit additional vocational expert testimony. Substantial evidence on the record as a whole supports the ALJ's findings, and his decision is not based on any legal error.[1] His decision should therefore be affirmed, this case dismissed, and judgment entered for the Commissioner of the Social Security Administration ("Commissioner").

---

[1] The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id. "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." See Collins v. Saul, 648 F.3d 869, 871 (8th Cir. 2011).

The record reflects that Cotton was born on September 30, 1996, and was twenty-four years old when he filed his application on September 7, 2021. He alleged in the application that he became disabled and unable to work on June 10, 2020, because of upper and lower extremity impairments. The ALJ denied Cotton's application on October 18, 2024. The ultimate question for the ALJ was whether Cotton was disabled for purposes of the Social Security Act from September 7, 2021, through October 18, 2024.

In the ALJ's decision denying Cotton's application, the ALJ summarized the evidence. In large part, there is no dispute about the evidence or the adequacy of the ALJ's summary. Cotton does, however, challenge the characterization of some of the evidence relevant to the evaluation of his subjective complaints. See Docket Entry 13 at CM/ECF 17-18. The Court will not repeat the ALJ's summary in full, although some of it will be repeated in order to place Cotton's assertions of error in an historical context.

Cotton first maintains that his residual functional capacity was erroneously assessed. He maintains that the assessment is flawed because it is not supported by "medical evidence of [his] ability to function after his [right] knee failed conservative care and required surgery," see Docket Entry 13 at CM/ECF 14, surgery in the form of arthroscopy chondroplasty.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most a person can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, and the assessment must be supported by some medical evidence. See Jones v. Astrue, 619 F.3d 963 (8th Cir. 2010). There is no requirement, though, that the assessment be supported by a specific medical opinion. See Hensley v. Colvin, 829 F.3d 926 (8th Cir. 2016).

The various treatment notes reflect that Cotton has a history of bilateral knee pain beginning in May of 2019.[2] He is morbidly obese, as he is approximately six feet tall and has weighed as much as 467 pounds. The notes reflect that he sometimes reported right knee pain and, on occasion, edema. Notwithstanding his complaints, he routinely had a normal gait and station, walked without restriction, and ambulated normally. He was treated conservatively, usually with medication, topical cream, and physical therapy.

---

[2] See e.g., Transcript at 838-843 (05/29/2020); 831-836 (07/07/2020); 823-828 (09/14/2020); 816-821 (11/29/2020); 808-814 (12/29/2020); 398-403 (02/25/2021), 392-396 (03/26/2021), 385-390 (04/29/2021), 370-376 (08/02/2021), 363-368 (08/17/2021), 349-354 (10/29/2021), 342-347 (11/12/2021), 739-744 (12/03/2021), 732-737 (01/28/22); 725-730 (03/31/2022); 718-723 (06/24/2022); 702-707 (09/15/2022); 695-700 (11/21/2022); 688-693 (02/07/2023); 681-686 (03/14/2023); 982 (04/05/2023); 674-679 (04/11/2023); 977-980 (04/20/2023); 972-973 (05/22/2023).

On a number of occasions, Cotton sought medical attention specifically for his right knee impairment. See, e.g., Transcript at 378-383 (05/28/2021), 951-955 (06/07/2021), 957-960 (06/23/2021); 356-361 (09/07/2021); 710-716 (08/25/2022); 1025-1026 (06/26/2023); 1037-1041 (05/13/2024); 1078-1082 (06/03/2024). A fair summation of the treatment notes is that they contain inconsistent findings and observations about the limitations caused by the impairment. For instance, at a September 7, 2021, presentation, Cotton had crepitus, pain, and a decreased range of motion in his knee. See Transcript at 715. He nevertheless had a normal gait and station. A September 17, 2022, x-ray of his knee was unremarkable, as the results showed, inter alia, no acute facture or dislocation, an intact joint, and normal soft tissue. See Transcript at 498. A June 26, 2023, x-ray produced similar results. See Transcript at 1025. At a May 13, 2024, presentation, an examination revealed, in part, the following: "Knee: Tender (at medial [joint] line), Swelling Present (mild post swelling), ROM Full In all Planes, ROM Painful (deep flexion), Crepitus Absent, Joint Stability Intact and Strength 5/5 Throughout." See Transcript at 1040. The notes from a June 3, 2024, presentation reflect that an MRI "did not show [a] cartilage or meniscal issue," see Transcript at 1078, but he had medial joint line tenderness to palpation.

In September of 2022, Cotton was seen for a consultative examination. See Transcript at 492-498. His history of present illness was taken and reflects, in part, the following:

> [Cotton] reports that he has right knee pain. He [received] a steroid injection in this knee, which didn't relieve pain, and he still has a baker's cyst. He states that ambulating causes pain in his right knee. He also states that his knee will lock on him or give out when he's ambulating. He states that rest relieves the pain occasionally. His mother reports that voltaren cream helps some. Ice, heat, [and] TENS units have not helped. [His] mother reports that when he overuses his knee, he [complains of] radiating pain down his calf and cramps to his upper thigh.

See Transcript at 492. Upon examination, Cotton had 5/5 strength in his right lower extremity, could tandem walk, had a normal gait and station, but complained of pain in his right knee when rising from a squatting position. Right knee pain was assessed, but no limitations in sitting, standing, or walking were noted.

Cotton's medical records were reviewed by state agency medical consultants in September of 2022. See Transcript at 62-66, 70-75. The consultants agreed that Cotton was capable of performing a reduced range of light work, work that requires a person to be capable in an eight hour workday of, inter alia, sitting intermittently and standing or walking for six hours. See Social Security Ruling 83-10.

On July 3, 2024, Cotton underwent an arthroscopy chondroplasty of his right knee because he had failed “all nonoperative management.” See Transcript at 1125. The post-operative note reflects, in part, that Cotton had an intact medial and lateral meniscus but had a “15 x 10 [millimeter] area of kind of mid to posterior medial portion of a medial femoral condyle with a grade 3 cartilage lesion.” See Transcript at 1125.

From July 3, 2024, forward, the medical record the ALJ had to consider is silent; it is devoid of any medical evidence addressing Cotton’s right knee impairment. If Cotton were seen for the impairment after July 3, 2024, the treatment note was never presented to the ALJ for his consideration. In fact, Cotton acknowledges that the record is silent, noting that there is “[n]o examination of [his right] knee after the day of surgery ...” See Docket Entry 20 at CM/ECF 6.

The ALJ evaluated the medical evidence in assessing Cotton’s residual functional capacity. The ALJ found the consultative examiner’s medical opinions generally persuasive. The ALJ declined to embrace the consultative examiner’s opinions as to Cotton’s exertional and postural limitations, though, because Cotton underwent knee surgery after the examiner offered her opinions and “greater exertional and postural [restrictions were] warranted.” See Transcript at 27.

The ALJ also considered the state agency medical consultants' medical opinions. The ALJ was partially persuaded by the opinions but found the opinions not entirely consistent with the medical record as Cotton's surgery indicated that greater restrictions were warranted.

The ALJ found that Cotton had the residual functional capacity to perform a reduced range of sedentary work, work that requires a person to be capable in an eight hour workday of, inter alia, sitting for a total of about six hours and standing or walking for no more than about two hours. See Social Security Ruling 83-10. The work was reduced because he could only occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds.

Clearly, Cotton has limitations caused by a right knee impairment. One of the questions for the ALJ was the extent to which Cotton's right knee impairment impacts his ability to sit and stand or walk. The medical evidence, although minimal, is capable of more than one acceptable characterization. Substantial evidence on the record as a whole supports the characterization made by the ALJ and, in turn, the assessment made of Cotton's residual functional capacity. The undersigned so finds because the ALJ adequately considered what little medical evidence he had before him and could reach a different conclusion than that advocated by Cotton.

Cotton challenges the assessment of his residual functional capacity because after discounting the medical opinions of the consultative examiner and the state agency medical consultants, the ALJ was left with "raw records from which he announced six hours of sitting [and] two hours of standing and walking ..." See Docket Entry 13 at CM/ECF 15. Cotton notes that the finding was made only fifteen weeks after his surgery and despite having testified that a second surgery was "on the table." See Id.

The ALJ is required to fully develop the record. See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994). There is no bright line test for determining if the ALJ fully developed the record. See Id. It involves examining whether the record contains sufficient information for the ALJ to have made an informed decision. See Pratt v. Asture, 372 Fed.Appx. 681 (8th Cir. 2010).

The undersigned is not persuaded that the ALJ failed to develop the record for at least two reasons. First, Cotton's attorney represented at the administrative hearing that the record was complete, save three medical records that were later included in the record and that did not add to what was already known about Cotton's right knee impairment. See Transcript at 38, 336. The ALJ could and did rely upon counsel's representation and could craft an assessment of Cotton's residual functional capacity on the basis of the record following the submission of the three medical records.

Second, the fact that Cotton underwent surgery at the close of the medical record does not eviscerate the prior treatment notes or warrant disregarding altogether the medical opinions of the consultative examiner and the state agency medical consultants. The surgery was an intervening event that caused the ALJ to view the prior treatment notes differently and to discount the exertional and postural portions of the medical opinions offered by the consultative examiner and the state agency medical consultants. Rather than find Cotton capable of performing a reduced range of light work, the ALJ found Cotton capable of performing a reduced range of sedentary work. Were the additional restrictions found by the ALJ insufficient? Cotton has not shown how they are, as he has offered nothing that the ALJ had before him to justify even greater restrictions than what he found.

The dilemma here is what to make of there being "[n]o examination of [Cotton's right] knee after the day of surgery ..." See Docket Entry 20 at CM/ECF 6. Stated differently, what was the extent of his right knee impairment after the arthroscopy chondroplasty? Although much is unclear, this much is clear: there is no evidence Cotton sought medical attention for his impairment during the period between his July 3, 2024, surgery and the ALJ's October 18, 2024, decision.

Cotton faults the ALJ for failing to order a second consultative examination. Cotton notes that such an examination would have aided in the evaluation of his right knee impairment.

An ALJ may, but is not required to, order a consultative examination. See 20 C.F.R. 416.917. He may do so, for instance, if the record is insufficient to determine if the claimant is disabled. See Id.

Here, a consultative examination after Cotton's July 3, 2024, surgery would have certainly been helpful in determining the extent to which he can sit and stand or walk. The undersigned is not persuaded, though, that the ALJ was required to have ordered such an examination. Although the medical evidence was minimal, it was adequate for the ALJ to make an informed decision.[3]

---

[3] Two additional points are necessary. First, the undersigned agrees with the Commissioner that the case at bar is distinguishable from Frankl v. Shalala, 47 F.3d 935 (8th Cir. 1995), and Noerper v. Saul, 964 F.3d 738 (8th Cir. 2020). In Frankl, the assessment of Frankl's residual functional capacity was identical to the limitations found in prior administrative medical findings, findings that were based on "stale evidence." See Docket Entry 19 at CM/ECF at 13. The ALJ here discounted the exertional and postural portions of the prior administrative findings. In Noerper, the ALJ adopted the findings of a medical professional whose findings "predated the majority of the treatment records ..." See Noerper v. Saul, 964 F.3d at 747. The ALJ here relied upon the entirety of the treatment records.

Second, in the midst of Cotton maintaining that the assessment of his residual functional capacity is flawed because it is not supported by "medical evidence of [his] ability to function after his [right] knee failed conservative care and required surgery," see Docket Entry 13 at CM/ECF 14, he raises issues relating to his hand impairment. For the reasons set forth by the Commissioner, see Docket Entry 19 at CM/ECF at 8-15, the ALJ did not err in evaluating Cotton's hand impairment.

Although never presented to the ALJ, there is a treatment note from ten months after the ALJ's decision and it is the basis for one of Cotton's assertions of error. Cotton appealed the denial of his application and presented as a part of his appeal a treatment note from August 14, 2025. See Transcript at 7-11. The note reflects that he was last seen by the provider on July 3, 2024, or on the date he underwent the arthroscopy chondroplasty of his right knee. He reported obtaining initial benefit from the surgery, but his pain "[had] returned [to the] same area." See Transcript at 7. Upon examination, his knee was tender and swollen. He had full, albeit painful, range of motion, intact joint stability, and 5/5 strength throughout. The Appeals Council denied his request for review and found that the August 14, 2025, treatment note did not relate to the period at issue and did not "affect the decision about whether [he] was disabled beginning on or before October 18, 2024." See Transcript at 2.

Cotton maintains that the Appeal Council erred when it refused to consider the August 14, 2025, treatment note. It is his contention that there is good cause for the timing of the note's submission, and the note is new, material, and relates to the period on or before the date of the ALJ's decision. Cotton additionally maintains that there is a reasonable probability the note would change the outcome of the ALJ's decision.

"Generally, the Appeals Council will not consider evidence in addition to that introduced at the [administrative] hearing." See 20 C.F.R. 1585(a). The Appeals Council will do so, though, if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." See 20 C.F.R. 20 C.F.R. 416.1470(a)(5). See also Box v. Shalala, 52 F.3d 168 (8th Cir. 1995 (applying 20 C.F.R. 404.970(b)).

The undersigned assumes, without deciding, that the August 14, 2025, treatment note is new and material. Setting aside whether the note relates to the period on or before the date of the ALJ's decision and setting aside the timing of the note, the undersigned cannot say that the Appeals Council erred in refusing to consider the note. For the following reasons, the Appeals Council could find that there is not a reasonable probability the note would change the outcome of the decision.

First, the treatment note is substantially similar to notes from within the relevant period. For instance, at a September 7, 2021, presentation, Cotton had crepitus, pain, and a decreased range of motion in his knee. See Transcript at 715. At a May 13, 2024, presentation, an examination revealed, in part, the following: "Knee: Tender (at medial [joint] line),

Swelling Present (mild post swelling), ROM Full In all Planes, ROM Painful (deep flexion), Crepitus Absent, Joint Stability Intact and Strength 5/5 Throughout." See Transcript at 1040. The findings and observations set forth in the August 14, 2025, treatment note are not markedly different than the other findings and observations in other notes.

Second, it is not clear how the August 14, 2025, treatment note is inconsistent with Cotton's ability to perform a reduced range of sedentary work. Although the note reflects that his knee was tender and swollen, he had full, albeit painful, range of motion, intact joint stability, and 5/5 strength throughout.

Cotton offers a second reason why his residual functional capacity was erroneously assessed. He maintains that his subjective complaints were not properly evaluated. It is Cotton's contention that the reasons the ALJ gave for discounting Cotton's complaints rest on a mischaracterization of the record, specifically, the ALJ erred in finding that Cotton's symptoms "improve[d] with treatment" and the ALJ's "handling of the objective evidence contains errors that matter." See Docket Entry 13 at CM/ECF 17-18. Cotton additionally maintains that the reasons relied upon by the ALJ rest on "misused daily activities" and "ignored regulatory factors." See Docket Entry 13 at CM/ECF 17.

In assessing the claimant's residual functional capacity, the ALJ must evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ must consider, in addition to objective medical evidence, any evidence relating to the following: "a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." See Id. at 1218 (citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984)). See also 20 C.F.R. 416.929; Social Security Ruling 16-3p. The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, not the courts. See Id.

In evaluating Cotton's subjective complaints, the ALJ noted his obligation to comply with Polaski v. Heckler, 20 C.F.R. 416.929, Social Security Ruling 16-3p. The ALJ recounted the medical evidence with respect to Cotton's symptoms and limitations, focusing primarily on his bilateral upper extremity impairments. The ALJ also summarized Cotton's representations at the administrative hearing. The ALJ found that although Cotton's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Cotton's statements concerning the intensity, persistence, and limiting effects of his symptoms are "not entirely consistent with the overall record ..." See Transcript at 24.

The ALJ's evaluation of the evidence relevant to Cotton's subjective complaints, while not exhaustive nor without peccadillo, was adequate and is supported by substantial evidence on the record as a whole. The undersigned so finds for the following reasons.

First, the ALJ considered the medical evidence. For instance, with respect to Cotton's bilateral upper extremity impairments, the ALJ noted that Cotton underwent a right cubital tunnel decompression on February 1, 2022, see Transcript at 25, 424-430, after which he had an appropriate range of motion in his right upper extremity, see Transcript at 25, 464-468. The ALJ noted that Cotton underwent a "left elbow ulnar nerve transposition" and "left elbow open medial epicondyle debridement" on January 10, 2023, see Transcript at 25, 1007-1009, after which he reported that his pain and numbness had subsided, see Transcript at 25, 997-1000. The ALJ noted that Cotton underwent a carpal tunnel release of his right wrist and "ulnar nerve transposition with medial epicondyle debridement" on April 5, 2023, see Transcript at 25, 914-918, after which he reported that he was markedly better despite having slight discomfort at times. See Transcript at 25, 914. The ALJ also noted that Cotton presented on October 2, 2023, complaining of pain in his right wrist, see Transcript at 25, 1218-1222, but an MRI was normal and he had full range of motion in his wrist.

With respect to Cotton's lower extremities impairments, the ALJ review of the evidence was not exhaustive. The ALJ noted that Cotton had undergone arthroscopy chondroplasty to his right knee on July 3, 2024, and noted the findings and observations of the consultative examiner and the medical opinions of the state agency medical consultants.

Based in large part on the foregoing, the ALJ found that Cotton's impairments improved with treatment. The ALJ's summation is not entirely correct. There is a treatment note from a January 8, 2024, presentation at which Cotton continued to complain of pain in his left wrist, see Transcript at 1058-1062, and the medical record closed with Cotton undergoing arthroscopy chondroplasty to his right knee because he had "failed all nonoperative management," see Transcript at 1125.

The ALJ's summation, though not entirely correct, does not warrant a remand. The summation was just that, a summation; it was not the hinge upon which the ALJ's decision swung. Also, there was some improvement with the treatment of Cotton's bilateral upper extremity impairments, and the January 8, 2024, treatment note reflects that only conservative treatment was recommended. With respect to Cotton's bilateral lower extremity impairments, he offered nothing to substantiate that his knee surgery justified greater restrictions than those found by the ALJ.

Cotton maintains that the ALJ's handling of the evidence contains "errors that matter." See Docket Entry 13 at CM/ECF 18.[4] Assuming, arguendo, that the ALJ mischaracterized some of the evidence, his mischaracterizations do not warrant a remand. They are not meaningful mischaracterizations and there is not a reasonable probability the characterizations, if corrected, would change the outcome of the decision.

The ALJ also considered Cotton's daily activities in assessing his residual functional capacity. See Transcript at 24. The ALJ noted that Cotton is capable of, inter alia, attending to his personal care, grocery shopping while leaning against a shopping cart, and performing some household chores, although he usually performs the chores while seated.

---

4 Specifically, Cotton alleges the following:

> ... [The ALJ's decision] describes the pre-2020 nerve testing as showing "only" mild to moderate ulnar compression "across the left elbow," when the report says the opposite: severe compression on the left, mild to moderate findings on the right. (Tr. 24; Tr. 529; Ex. 10F/24.) It credits the consultative examination as showing "no limitations in range of motion" and full strength throughout, when the report documents limited extension of the right elbow, right grip strength of 4/5 and squatting and rising performed with difficulty. (Tr. 26; Tr. 494-96; Ex. 8F/3-5.) It attributes that examination to a physician when the examiner was a nurse practitioner. (Tr. 497-98; Ex. 8F/6-7.) And its ultimate anchor, unremarkable knee imaging, proves the opposite of what the ALJ took from it: the x-rays and MRI stayed normal while a grade 3 cartilage lesion sat in the joint, as the arthroscope proved in July 2024 and as Dr. Greer reiterated in 2025 when the films showed a lesion requiring an allograft. (Tr. 1125; Ex. 19F/57; Tr. 7.)

See Docket Entry 13 at CM/ECF 18-19.

The ALJ considered the location and intensity of Cotton's pain, as well as precipitating and aggravating factors. See Transcript at 24. The ALJ noted that Cotton experiences discomfort with his hands and knees. Cotton reported being unable to lift more than ten pounds and drops things because of his bilateral upper extremity impairments. He reported that he can only sit for about fifteen minutes, stand for about twenty minutes, and walk for about fifteen minutes.

The ALJ considered other treatment and measures Cotton uses, or has used, to help alleviate his symptoms. See Transcript at 24. The ALJ noted that although Cotton can shop for groceries, he uses a shopping cart for support. Cotton has also been diagnosed with asthma, which causes him difficulty with exertion, and has been prescribed an albuterol inhaler to treat the impairment.

The ALJ made no mention of the type, effectiveness, and side effects of Cotton's medications nor his work history. The ALJ's failure to do so, though, does not warrant a remand as those factors are not particularly compelling.

The question for the ALJ was the extent to which Cotton's pain and limitations impact the most he can do. The ALJ incorporated restrictions into the assessment of Cotton's residual functional capacity but not to the

extent he believes is warranted by the evidence. The ALJ could find as he did, though, as substantial evidence on the record as a whole supports his evaluation of the evidence.

Cotton last maintains that the ALJ erred at step five when he failed to solicit additional vocational expert testimony. Specifically, Cotton maintains that the ALJ failed to comply with Emergency Message ("EM") 24027 in determining Cotton could perform jobs that included parts inspector, a job sometimes identified as "nut sorter."

At step five, the ALJ must determine if the claimant is able to do any work existing in the national economy. See Crawford v. Colvin, 809 F.3d 404 (8th Cir. 2015). In making the showing, the ALJ may rely upon the testimony of a vocational expert, and the testimony must "generally be consistent with the [Dictionary of Occupational Titles or 'DOT']." See Peters v. Berryhill, 4:16-cv-01342-PLC, 2018 WL 1858159, 2 (E.D.Mo. 2018).

Because the "[d]escriptions of occupations in the DOT may refer to job materials or processes that have been replaced by more modern materials or process," EM-24027 was promulgated. See Barr v. Bisignano, No. 3:26-cv-00108-LPR-JJV, 2026 WL 3217376, 2 (E.D. Ark. Oct. 26, 2026) (quoting EM 24027, https://secure.ssa.gov/apps10/reference.nsf/links/01062025092030AM). The EM provides that the ALJ may not cite any of

thirteen enumerated DOT occupations, one of which is "nut sorter," to support a 'not disabled' determination without "additional evidence from a ... [vocational expert] supporting the ALJ's conclusion that, as the occupation is currently performed, its requirements are consistent with the individual's [residual functional capacity] and the job exists in significant numbers.'" See Id. at 2 (quoting EM 24027).

A vocational expert testified during the administrative hearing. See Transcript at 54-60. At the outset of the hearing, she agreed to state if she had an opinion that conflicted with information contained in the DOT. She testified that a hypothetical individual identical to Cotton could perform work as a machine tender, assembler, and parts inspector/nut sorter. With regard to the parts inspector/nut sorter, the ALJ and vocational expert had the following exchange:

> [ALJ]: And is that particular job that you identified, in terms of tools and work processes, is that performed the same today compared to when it was characterized by the [DOT]?
>
> [Vocational Expert]: The technology has definitely changed the way the assembly line works, and the way that the items come down the conveyer. However, in terms of how the job is actually performed, it remains the same exertion and skill level.

See Transcript at 57.

The ALJ, in his decision, addressed the directives set forth in EM-24027. Specifically, he found the following:

> The vocational expert added that the job of a parts inspector has changed since the [DOT] was published; however, the requirements of the job, the specific vocational preparation and skill level still fit the hypothetical profile given. Pursuant to SSR 00-4p, the [ALJ] has determined that the vocational expert's testimony is consistent with the information contained in the [DOT].

See Transcript at 28.

Here, the ALJ obtained the required "additional evidence." The vocational expert testified, and the ALJ found, that although the job of parts inspector/nut sorter had changed since the DOT was published, the requirements of the job were still performed at the sedentary level.[5]

Cotton additionally maintains that the ALJ erred in finding the vocational expert's testimony consistent with the DOT, as the vocational expert testified that the job of inspector/nut sort had changed. The ALJ did not err. Although the technology surrounding the job has changed, how the job is performed has not.

---

[5] The Commissioner represents, and the undersigned agrees, that "[t]here is no strict requirement as to ... what 'additional evidence' must be solicited with regard to the positions identified in EM-24027 ..." but "numerous Courts have concluded that similar testimony as that elicited here amply satisfies the requirements outlined in the [EM]." See Docket Entry 19 at CM/ECF 6.

"It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the [ALJ's] decision if that decision is supported by good reason and is based on substantial evidence." See Dillon v. Colvin, 210 F.Supp.3d 1198, 1201 (D.S.D. 2016). In fact, the Court may not reverse the ALJ's decision merely because substantial evidence would have supported an opposite decision. See Id.

In this instance, the ALJ could find as he did as his findings are supported by substantial evidence on the record as a whole and he committed no legal error. The undersigned therefore recommends that the ALJ's decision be affirmed. Cotton's complaint should be dismissed, all requested relief should be denied, and judgment should be entered for the Commissioner.

DATED this 9th day of November, 2026.

UNITED STATES MAGISTRATE JUDGE